UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

DANIEL WHIPPLE,

         Plaintiff,

 -against-            5:12-CV-0588 (LEK/CFH)

CAROLYN W. COLVIN, Acting
Commissioner of the Social Security
Administration[1],

         Defendant.

## MEMORANDUM-DECISION and ORDER

**I. INTRODUCTION**

This action for judicial review is before the Court following a final decision of the Commissioner of the Social Security Administration ("SSA") denying Plaintiff Daniel Whipple ("Plaintiff") benefits. Both parties have filed briefs. Dkt. Nos. 12 ("Plaintiff's Brief"); 15 ("Defendant's Brief"). For the reasons discussed below, the decision is affirmed.

**II. BACKGROUND**

 **A. Procedural History**

Plaintiff applied for Title II Disability Insurance Benefits on January 29, 2009, alleging a period of disability beginning on May 31, 2008. Tr. at 193. The SSA denied his application on March 31, 2009. Id. at 92-96. Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Id. at 101-02. On August 2, 2010, Plaintiff appeared with counsel before ALJ John Ramos. Id. at 48. ALJ Ramos denied the application on August 27, 2010. Id. at 14-25. The

---

[1]

Appeals Council denied Plaintiff's request for review on February 13, 2012, rendering ALJ Ramos's decision the final decision of the Commissioner. Id. at 1-5. Plaintiff filed this action.

**B. Factual History**

*1. Pre-disability Period*

Plaintiff is a fifty-two-year-old man with an associate degree in criminal justice from Onondaga Community College. Tr. at 448. He worked as a firefighter between 1993 and 2006. Id. at 537. He was diagnosed with psychotic disorder and depression after six trips to Community General Hospital during 1996 and 1999. Id. at 448. On May 18, 2006, Plaintiff saw Dr. Jane Kou for a voluntary psychiatric evaluation to determine "if he [was] medically fit to perform the duties of his position as a firefighter." Tr. 537-38.[2] Although Plaintiff stated that he had been out of work since March 30, 2006, due to depression, he also stated that "his psychiatric problem [did] not interfere with his job" and "denie[d] any psychotic symptoms." Id.

Dr. Kou found that Plaintiff was "well oriented in all spheres." Id. at 538. She noted Plaintiff had "gazing" eye contact, "poor" recent and immediate memory—although his remote memory was not impaired—and "mildly slowed reaction time." Id. Plaintiff experienced "mild paranoia" and had difficulty with attention. Id. Plaintiff denied any thoughts of suicide or homicide. Id. Dr. Kou ultimately diagnosed Plaintiff with schizoaffective disorder. Id. She opined that Plaintiff "is not capable to work as a firefighter due to cognitive impairment" and recommended further neuropsychological testing to determine the degree of impairment. Id.

---

[2] The transcript was docketed in seven parts. See Dkt. No. 10. The pagination cited is the page number assigned by the SSA.

Dr. Roger Levine was Plaintiff's regular treating neuropsychiatrist. Id. at 537. From 2006 to 2008, Dr. Levine consistently noted that Plaintiff was "doing well." Id. at 437-45. Although Plaintiff seemed sad over his failing marriage and Dr. Levine found Plaintiff's affect somewhat restricted, Plaintiff was able to work as a truck driver.[3] Id. at 435-39. On February 20, 2008, Plaintiff visited Dr. Levine. Id. at 436. Plaintiff stated that he did not have a lot of energy. Id. Dr. Levine determined that Plaintiff suffered from chronic schizoaffective disorder and prescribed Prozac to give Plaintiff energy. Id. On April 16, 2008, Plaintiff returned to Dr. Levine and complained of sleeping problems. Id. at 435. Plaintiff reported that he lost another trucking job due to a lack of sleep. Id. Dr. Levine prescribed Seroquel to help Plaintiff sleep. Id. Plaintiff did not report any other issues. Id. During a follow-up visit on May 19, 2008, Plaintiff stated that Seroquel was helpful and that he was also taking Ambien. Id. at 434. Dr. Levine suggested increasing the Seroquel dosage and stopping the Ambien. Id. Plaintiff reported that he was having difficulty finding a local trucking job but reported no other issues. Id. Again, Dr. Levine noted that Plaintiff was "[d]oing okay on the whole." Id. On June 16, 2008, Plaintiff reported that he was able to sleep better with Seroquel; he did not complain about sleep problems after that visit. Id. at 431-33.

  *2. Post-onset Date (May 31, 2008)*

On June 16, 2008, Dr. Levine noted that Plaintiff looked "a bit sad" but reported that medication was helping and no changes were needed. Id. at 431. On October 8, 2008, Plaintiff returned to Dr. Levine and reported experiencing "some daytime sedation with the Seroquel and Ambien together." Id. at 432. Plaintiff reported that he was still looking for a job. Id. Dr. Levine

---

[3] On May 14, 2007, Plaintiff reported that he was fired from a job driving a garbage truck but Dr. Levine determined that it was not related to any psychiatric symptoms. Tr. at 439.

3

noted that Plaintiff was "still doing about the same." Id. Dr. Levine switched Plaintiff from Prozac to another, unspecified medication. Id. During a follow-up visit on February 11, 2009, Dr. Levine prescribed Xanax and continued Plaintiff on Seroquel. Id. at 431. Dr. Levine noted that everything else "[c]ontinues about the same." Id. Plaintiff reported that he was still searching for a job but would be applying for long-term disability and Medicare. Id. During a complete examination on February 26, 2009, Plaintiff's primary care physician, Dr. Manfredi, noted that Plaintiff's bipolar disorder was "well controlled." Id. at 527.

On March 5, 2009, Plaintiff was examined by a consultative physician, Dr. Jeanne A. Shapiro, for a psychiatric evaluation. Id. at 448-52. Plaintiff reported that he last worked as a truck driver for ten months until he was terminated in April 2008. Id. at 448. He claimed that he was unable to work because of schizoaffective disorder, bipolar disorder, and anxiety. Id. Plaintiff complained that he had sleep issues and felt "depressed," "sad," and "tired." Id. at 449. He reported anxiety and nervousness but did not go into detail. Id.

Dr. Shapiro noted that Plaintiff's "demeanor and responsiveness to questions was cooperative" and that "[h]is manner of relating, social skills, and overall presentation was adequate." Id. at 450. Dr. Shapiro noted that Plaintiff displayed good personal hygiene and grooming. Id. Plaintiff's speech intelligibility seemed fluent and his thought processes were coherent. Id. Plaintiff was described as "calm" and "relaxed." Id. There were no problems reported regarding his attention and concentration, recent and remote memory skills, or cognitive functioning. Id. Plaintiff's insight and judgment were characterized as "fair." Id. Plaintiff reported that he supported himself—dressing, bathing, grooming, cooking, cleaning, doing laundry, shopping, managing money, and driving on a daily basis—and that he was getting along with his

family and friends.  Id. 451.  He did chores, cared for pets, and visited his father, who suffers from Alzheimer's disease.  Id. at 433, 451.

Dr. Shapiro's diagnoses included bipolar disorder, Barrett's esophagus, and migraines.  Id. at 451.  She opined that

> Vocationally, the Plaintiff may have difficulty adequately understanding and following some instructions and directions as well as completing some tasks given that he complains of memory and concentration deficits secondary to bipolar disorder.  He may have difficulty interacting appropriately with others at times due to psychiatric symptoms.  Attending worker [sic] maintaining a schedule may be difficult at times due to lack of motivation and lethargy.  He does not appropriately manage stress.

Id.  She recommended that Plaintiff continue psychiatric treatment with Dr. Levine.  Id.

On the same day, Plaintiff was examined by Dr. Kalyani Ganesh, a consultative physician, for an internal medicine examination.  Id. at 353-56.  Dr. Ganesh's diagnoses included Barrett's esophagus, mental health issues, and migraine headaches.  Id. at 455.  She noted Plaintiff had "no gross physical limitation noted to sitting, standing, walking, or the use of upper extremities."  Id.  Dr. Goodman, a consultative physician, conducted a Physical Residual Functional Capacity Assessment on March 27, 2009, which involved both in-person assessment and a review of the record.  Id. at 457-62.  Dr. Goodman determined that Plaintiff could lift up to fifty pounds occasionally; lift up to twenty-five pounds frequently; and stand, sit, and/or walk about six hours in an eight hour day.  Id. at 458.  In support of this conclusion, Dr. Goodman noted that Plaintiff "alleged disability due to psych problems . . . [and] he [did] not indicate on his application that these are the conditions that limit his ability to work."  Id.

On March 26, 2009, psychologist Dr. L. Meade indicated in the Psychiatric Review Technique form that Plaintiff's impairments were "not severe."  Id. at 470.  On July 29, 2010, Dr. Levine completed a Medical Source Statement that characterized Plaintiff's mental abilities and

5

aptitudes needed to do unskilled work as "limited but satisfactory" in all categories. Id. at 535-36. Dr. Levine noted that Plaintiff would miss about one day per month of work, on average, due to impairments or treatment. Id. at 536. During 2009 and 2010, Plaintiff saw Dr. Levine four times. Id. at 509-11, 535-36. On the whole, Plaintiff appeared to be "doing okay" or "about the same." Id. at 510-11. Plaintiff was still not working and stated that he was thinking of relocating to a sunnier climate. Id. at 511.

## III. STANDARD OF REVIEW

### A. Standard for Benefits

Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C.A. § 423(d)(1)(a). Moreover, a Plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

In determining whether a Plaintiff has a disability, the Commissioner applies a five-step process. See 20 C.F.R. §§ 404.1520, 416.920. "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." Barnhart v. Thomas, 540 U.S. 20, 24 (2003). The five-step process is as follows:

> First, the Secretary considers whether the Plaintiff is currently engaged in substantial gainful activity. If he [or she] is not, the Secretary next considers whether the Plaintiff has a "severe impairment" which significantly limits his [or her] physical or mental

6

ability to do basic work activities. If the Plaintiff suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the Plaintiff has an impairment which is listed in Appendix 1 of the regulations. If the Plaintiff has such an impairment, the Secretary will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the Secretary presumes that a Plaintiff who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity. Assuming the Plaintiff does not have a listed impairment, the fourth inquiry is whether, despite the Plaintiff's severe impairment, he [or she] has the residual functional capacity to perform his past work. Finally, if the Plaintiff is unable to perform his past work, the Secretary then determines whether there is other work which the Plaintiff could perform.

Bush v. Shalala, 94 F.3d 40, 44-45 (2nd Cir. 1996) (citations omitted). The plaintiff bears the burden of proof with regard to the first four steps; the Commissioner bears the burden on the fifth step. Kohler v. Astrue, 546 F.3d 260, 265 (2d Cir. 2008).

**B. Standard of Review**

In reviewing an SSA decision, a court's role is to determine whether the ALJ's findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standards. 42 U.S.C. § 405(g); Featherly v. Astrue, 793 F. Supp. 2d 627, 630 (W.D.N.Y. 2011) (citations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consol. Edison Co. of New York v. Nat'l Labor Relations Bd., 305 U.S. 197, 229 (1938). It must be "more than a mere scintilla" of evidence scattered throughout the administrative record. Featherly, 793 F. Supp. 2d at 630.

The reviewing court should not affirm an ALJ's decision if it reasonably doubts that the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987). If the ALJ applied the correct legal standards, the decision must be upheld "even where substantial evidence may [also] support the plaintiff's position." Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992); see also Rutherford v. Schweiker, 685 F.2d 60, 62 (2d Cir. 1982). In order to satisfy the "substantial

7

evidence" standard, an ALJ's conclusions must be supported by "such *relevant* evidence as a reasonable mind might accept as adequate to support a conclusion." Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). The reviewing court may not determine *de novo* whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). It must afford the SSA's determination considerable deference and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984).

## IV. DISCUSSION

Plaintiff contends that: (1) the ALJ's Step 4 residual functional capacity finding is unsupported by substantial evidence; (2) the ALJ failed to apply the appropriate legal standards in assessing Plaintiff's credibility at Step 4; and (3) the ALJ's Step 5 determination is unsupported by substantial evidence. See generally Pl.'s Br.

### A. The ALJ's Step 4 Determination

The ALJ found that:

> [Plaintiff can] perform a full range of work at all exertional levels. However, due to his mental impairments, he is limited to simple work. [Plaintiff] retains the ability to understand, follow and carry out simple instructions and directions; perform simple tasks with supervision and independently; maintain attention and concentration for tasks; regularly attend to a routine and maintain a schedule; relate to and interact appropriately with others; and handle reasonable levels of simple, repetitive work-related stress.

Pl.'s Br. at 7. Plaintiff alleges that the ALJ failed to properly weigh the opinion of consultative examiner Dr. Shapiro and failed to apply the "special technique" for evaluating mental impairments. Id. at 7-11.

*1. Consultative Examiner's Opinion*

Step 4 requires an ALJ to determine what vocational capacity a plaintiff retains. Butler, 926 F. Supp. 2d at 475. A plaintiff's residual functional capacity is determined by examining the plaintiff's own statements regarding his impairments, the observations of others who have familiarity with the plaintiff, and the observations of medical sources. See generally 20 C.F.R. § 416.929. The ALJ is required to give a treating physician's opinion as to the nature and severity of the impairment controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008). Treating physicians' opinions that are inconsistent with the opinions of other medical experts cannot be given controlling weight, but expert opinions that are not sufficiently substantial will not undermine the opinion of a treating physician. Burgess, 537 F.3d at 128-29 (citing Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000)).

Furthermore, when a treating physician's opinion is not given controlling weight, the ALJ must consider the factors set out in 20 C.F.R. § 404.1527(d)(2) to determine what weight the opinion should receive, namely:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). An ALJ's opinion that does not comprehensively set out reasons for assigning less than controlling weight to a treating physician's

opinion will be remanded. Halloran, 362 F.3d at 33; Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999).

Here, ALJ Ramos's decision heavily relied on Dr. Levine's treatment notes spanning the relevant medical period, which is consistent with the treating physician rule. The medical evidence collected by Dr. Levine between 2008 and 2010 does not substantiate Plaintiff's allegation of debilitating symptoms. Tr. at 22. While Dr. Levine found that Plaintiff's affect was somewhat restricted and prescribed Prozac to "give [Plaintiff] more energy," Plaintiff was "[o]n the whole doing pretty well." Id. at 436. Dr. Levine assessed Plaintiff's mental abilities and aptitudes needed to do unskilled work as "limited but satisfactory." Id. at 535-36. Plaintiff's impairments or treatments would require work absence only about one day a month. Id. at 536. This assessment is consistent with Dr. Meade's opinion that Plaintiff's impairments were "not severe." Id. at 470. This is also consistent with Dr. Goodman's assessment that there were no indications, even self-reported, that Plaintiff's psychiatric conditions limited his ability to work. Id. at 458.

Dr. Shapiro's one-time examination was afforded little weight for "several reasons," including that Plaintiff's complaints of memory and attention deficit were contrary to Dr. Shapiro's own findings and that her opinion of Plaintiff's limitations were vague. Id. at 23. Plaintiff argues that Dr. Shapiro's opinion was well-supported by record evidence. But the other doctors' medical opinions echoed Dr. Levine's determinations, not Dr. Shapiro's. Pl.'s Br. at 8. Dr. Shapiro diagnosed Plaintiff with bipolar disorder, Barrett's esophagus, and migraines. Tr. at 451. But a month before Dr. Shapiro's consultation, Plaintiff did not complain of physical disabilities to his primary care physician, Dr. Manfredi, who noted that Plaintiff's bipolar disorder was "well controlled" a month before Dr. Shapiro's consultation. Id. at 527. And that Dr. Kou opined that

"Plaintiff was 'not capable [of working] as a firefighter due to cognitive impairment' and 'recommend[ed] . . . neuropsychological testing to determine the degree of [the] impairment'" does not prove that Plaintiff was not able to perform any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2)(A); Tr. at 538. Further, Plaintiff worked as a truck driver for ten months during 2007 and 2008, thereby engaging in substantial gainful work immediately before the onset date. Tr. at 448. There is no indication that any change rendered Plaintiff unable to continue to do so after the onset date. Id. at 435, 448. The sleep problems were controlled by Seroquel at the start of the onset period and Dr. Levine noted that Plaintiff would need to miss only about one day of work per month. Id. at 434-35, 536.

Plaintiff's second argument—that Dr. Shapiro's opinion was not vague because she relied upon Plaintiff's report of memory and attention deficits—falls short because Dr. Shapiro's own objective findings contradict Plaintiff's report. Dr. Shapiro noted that "[Plaintiff's] attention and concentration was intact . . . . His recent and remote memory skills were intact . . . . His intellectual functioning is estimated to be in the average range. His general fund of information appears to be appropriate to experience." Id. at 450. Plaintiff reported to Dr. Shapiro that he was able to support himself by doing daily chores, managing finances, and taking care of his father and pets. Id. at 451. ALJ Ramos's determination that Plaintiff "retains the ability to understand, follow and carry out simple instructions and directions; perform simple tasks with supervision and independently; [and] maintain attention and concentration for tasks" is consistent with Dr. Shapiro's own observations. Because the residual functional capacity determination properly gave weight to the evaluations of Dr. Levine and Dr. Shapiro, the determination was proper.

*2. "Special technique" Application*

Plaintiff contends that ALJ Ramos failed to apply the "special technique" for evaluating mental impairments when making his residual functional capacity finding. Pl.'s Br. at 11. An ALJ must examine four areas of activities in order to determine the degree of functional loss caused by a mental impairment: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) deterioration or decompensation in work or work-like settings. See 20 C.F.R. § 404.1520a; SSR 96-8p, 1996 WL 374184. The degree of limitation in the first three areas is rated as mild, moderate, marked or extreme; the fourth area is rated on a four-point scale: none, one, two, three, or four or more. 20 C.F.R. § 404.1520a. The ALJ's "decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s)." 20 C.F.R. § 404.1520a.

SSR 96-8p provides that the mental residual functioning capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment than at steps 2 and 3. The ALJ must itemize various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in § 12.00 of the Listing of Impairments and summarized in the Psychiatric Review Technique. SSR 96-8p, 1996 WL 374184.

Plaintiff argues that the ALJ "did not explain his conclusion in regards to activities of daily living." Pl.'s Br. at 10. However, ALJ Ramos did break down each of the four categories and each determination was supported by substantial evidence in the record. Tr. at 20-21. Plaintiff's ability to "dress, bathe, and groom himself . . . , get[] along well with his friends and family . . . , help[] his siblings care for his father who has dementia," and that he "reports no problems getting along with

authority figures" supports the ALJ's determination that Plaintiff had only mild restriction in his activities of daily living. Id. at 20 (citations omitted); see Sipe v. Astrue, 873 F. Supp. 2d 471, 479-80 (N.D.N.Y. 2012) (citing these activities as the special-technique considerations). The ALJ's detailed explanations clearly identified findings regarding the degree of Plaintiff's limitations in each functional area and demonstrated that the ALJ properly considered all evidence relevant to those areas. See Kohler v. Astrue, 546 F.3d 260, 269 (2d Cir. 2008). The ALJ's findings are therefore affirmed.

### 3. *The ALJ's Credibility Determination*

Plaintiff objects to ALJ Ramos's determination that "the Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Pl.'s Br. at 11; Tr. at 22.[4] "[I]t is the function of [the ALJ], not [the Court,] to . . . appraise the credibility of witnesses." Pellam v. Astrue, 508 F. App'x 87, 91 (2d. Cir. 2013) (quoting Carroll v. Sec'y of Health and Human Servs., 705 F.2d 638, 642 (2d Cir. 1983)). An ALJ is not required to accept a plaintiff's subjective complaints without inquiry. Rockwood v. Astrue, 614 F. Supp. 2d 252, 270 (N.D.N.Y. 2009). However, when rejecting such complaints for lack of credibility, the ALJ "must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is based on substantial evidence." Martone v. Apfel, 70 F. Supp. 2d 145, 152 (N.D.N.Y. 1999) (quoting Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)). The ALJ must follow a two-step process to determine the credibility of a plaintiff's symptoms. 20 C.F.R. §§ 404.929, 404.1529. Once the ALJ

---

[4] Plaintiff's alleged symptoms include depression, schizoaffective disorder, and bipolar disorder, all of which he alleges contributed to his inability to work because they cause him trouble concentrating, focusing, and sleeping. Tr. at 22.

13

has found that the plaintiff has a medically determinable impairment that could reasonably be expected to produce the plaintiff's symptoms, she must evaluate the intensity and persistence of the symptoms, and the extent to which the symptoms limit the plaintiff's ability to work. 20 C.F.R. §§ 404.929(c), 404.1529(c). Severity of impairment should be evaluated with reference not only to objective medical evidence, but also to other factors found in the record, including: the plaintiff's daily activities; the location, duration, frequency, and intensity of pain and other symptoms; precipitating and aggravating factors; type, dosage, effectiveness and side effects of medication; other treatments sought for relief of pain or symptoms; other measures taken by the plaintiff to relieve symptoms; and any other factors causing functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.929(c)(3)(i)-(vii), 404.1529(c)(3)(i)-(vii). The Court finds no error in the ALJ's findings.

Plaintiff alleges that the ALJ failed to consider: Plaintiff's February 20, 2008 report of lack of energy; Dr. Levine's medication switch from Risperdal to Seroquel and Plaintiff's sedation from taking Seroquel and Ambien together; and that Plaintiff's loss of his trucking job due to a lack of sleep. Pl.'s Br. at 12-13.

First, Dr. Levine prescribed Prozac during the February 20 visit and noted that Plaintiff was "[o]n the whole doing pretty well." Id. at 436. In fact, during the April 16, 2008 follow-up visit with Dr. Levine, Plaintiff did not complain of lethargy. Id. at 435. Second, ALJ Ramos's thorough discussion of Dr. Levine's treatment notes indicates that the ALJ considered *all* relevant medical records, including prescription changes. Tr. at 22-23. The ALJ need not explicitly reconcile every conflicting shred of evidence. See Zabala v. Astrue, 595 F.3d 402, 410 (2d Cir. 2010) (quoting Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983)). Further, Dr. Levine told Plaintiff to stop

14

taking Ambien, which Plaintiff was taking on his own initiative, to alleviate daytime sedation. Tr. at 434. Finally, Plaintiff reported on May 19, 2008 that Seroquel was "definitely help[ing] with the sleep" Tr. at 434. Again, on June 16, 2008, Plaintiff stated that "he slept with the 400 of seroquel [sic] and no Ambien." Id. at 433. In subsequent visits, Plaintiff did not complain about sleep. Id. at 431-32. As discussed *supra*, objective medical evidence, coupled with records of Plaintiff's daily activities and self-reported progress, supports the ALJ's finding that Plaintiff's statements concerning the intensity, persistence, and limiting effects of symptoms are "not entirely credible."

### B. The ALJ's Step 5 Determination

Plaintiff last argues that the ALJ's Step 5 determination was unsupported by substantial evidence and the ALJ should have consulted with a vocational expert.[5] Pl.'s Br. at 13. At Step 5, the burden is on the Commissioner to prove that "there is other gainful work in the national economy which the Plaintiff could perform." Monette v. Astrue, 269 F. App'x 109, 111 (2d Cir. 2008) (quoting Balsamo v. Chater, 142 F.3d 75, 80 (2d Cir. 1998)). "When an individual's impairments and related symptoms are purely exertional, and the individual's vocational profile is listed in the regulations, then the Medical Vocational Guidelines (the Grids) are applied directly to determine whether the individual is disabled or not disabled." Anderson v. Comm'n of Soc. Sec., 2009 WL 3064764, *8 (N.D.N.Y. Sept. 22, 2009) (citing 20 C.F.R. §§ 404.1569a(b), 416.969a(b)). If properly applied, the Grids results fulfill Step 5 without the requirement of a vocational expert. Id. "Where significant nonexertional impairments are present at the fifth step in the disability analysis . . . 'application of the grids is inappropriate.'" Rosa v. Callahan, 168 F.3d 72, 82 (2d Cir.

---

[5] This argument is superfluous because if a plaintiff is found to be "disabled" or "not disabled" at any step in the sequence, there is no need to consider subsequent steps. 20 C.F.R. § 404.1520. Here, Plaintiff was properly found to be "not disabled" at Steps 3 and 4.

1999) (citing Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986)). In such a case, the ALJ must introduce the testimony of a vocational expert or other similar evidence.

Plaintiff points to Dr. Levine's opinion that Plaintiff would need to miss work for approximately one day per month due to his mental impairments to argue that Plaintiff did suffer significant nonexertional limitations.[6] Id. at 14. Nonexertional limitations include difficulty functioning because of depression, difficulty maintaining attention or concentration, and difficulty understanding or remembering detailed instructions. 20 C.F.R §§ 404.1569a(c)(1)(i); 414.969a(c)(1)(i). Significant nonexertional impairments encompass "additional loss of work capacity beyond a negligible one, or in other words, one that so narrows a claimant's possible range of work as to deprive him of a meaningful employment opportunity." Bapp, 802 F.2d at 605. The ALJ properly characterized Plaintiff as having insignificant nonexertional limitations because Plaintiff "retain[ed] the ability to meet the basic mental demands of unskilled work [and] these limitations have little or no effect on the occupational base of unskilled work at all exertional levels." Tr. at 24. This is consistent with the opinion of Dr. Shapiro, who observed that Plaintiff had no problems maintaining attention and concentrations, cognitive functions, and memory. Id. at 450. Plaintiff reported that he lost his trucking driving job due to sleeplessness—which seemed better a month after the onset date—and not depression. Id. at 435, 448. According to the medical evidence and Plaintiff's own reports, his psychiatric symptoms do not preclude him from finding another job.

---

[6] Plaintiff also repeats the residual functional capacity and credibility arguments and re-emphasizes Dr. Shapiro's opinion, which the Court addressed *supra*. Pl.'s Br. at 13.

16

Dr. Goodman determined that Plaintiff is able to lift up to fifty pounds occasionally, lift twenty-five pounds frequently, and stand, sit, and/or walk about six hours in an eight hour day. Id. at 458. Dr. Levine determined that Plaintiff's mental abilities and aptitudes needed to do unskilled work are "limited but satisfactory." Id. at 535-36. Plaintiff has some college and extensive work history. Id. at 448, 537. Plaintiff does have the ability to meet the demands of unskilled work. Thus, a vocational expert was unnecessary to the Step 5 determination and Plaintiff was properly characterized as "not disabled" under the Grid system. Tr. at 24 (citing 20 C.F.R. § 414.204.00(P)(2); SSR 85-15, 1985 WL 56857 (Jan. 1, 1985)).

## V. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the Commissioner's decision is **AFFIRMED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties.

**IT IS SO ORDERED.**

DATED: March 21, 2014
Albany, NY

Lawrence E. Kahn
U.S. District Judge